# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ISIAH ELDER, DONALD HART, and TIMOTHY ELDER, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 12 C 1157 |
| COMCAST CORPORATION and COMCAST CABLE MANAGEMENT, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiffs Isiah Elder, Donald Hart, and Timothy Wharton (collectively, "Named Plaintiffs") are former service technicians at defendants Comcast Corporation and Comcast Cable Management, LLC (collectively, "Comcast"). They sued Comcast alleging that Comcast violated three statutes—the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWCPA"), 820 ILCS 115/1 *et seq.*—by failing to pay service technicians for all of the time they were required to work, including overtime. (Dkt. No. 56 ("Am. Compl.").)

On October 9, 2012, pursuant to a joint motion (Dkt. No. 65) by the parties, the court conditionally certified an FLSA collective class of Comcast service technicians who have been employed at Comcast's South Chicago facility since October 4, 2009. (Dkt. No. 70.) The case proceeded through the close of discovery and 74 additional service technicians have opted into

the suit. (Dkt. No. 165 at 1.) Comcast has moved to decertify the FLSA collective class. (Dkt. No. 169.) Plaintiffs, by contrast, have moved to certify three classes—covering all Comcast service technicians employed in the state of Illinois—under Rule 23(b)(3) of the Federal Rules of Civil Procedure. (Dkt. No. 162.) The court refrained from ruling on the pending motions while the parties engaged in settlement discussions, (*see* Dkt. No. 193), which ultimately did not bear fruit. Accordingly, for the reasons stated below, Plaintiffs motion for class certification (Dkt. No. 162) is denied and Comcast's motion for FLSA decertification (Dkt. No. 169) is granted.

## BACKGROUND

Comcast service technicians install and repair Comcast products, including cable television, high-speed internet, and landline telephone service. (Dkt. No. 175 at 4.) The 74 service technicians who opted into the FLSA collective action all worked at Comcast's South Chicago facility located on 112th Street in Chicago, Illinois. (Dkt. No. 174 at 3.) Across all of Illinois, Comcast has employed approximately 4,477 service technicians since February 17, 2002 and approximately 2,726 service technicians since February of 2009.[1] These service technicians have been assigned to 52 different garages and have worked under 294 different supervisors since 2002.

In February 2009, as part of a larger plan to improve customer service, Comcast launched a home dispatching program. (Dkt. No. 162-6.) Service technicians who "home dispatch" drive a Comcast vehicle directly from their home to their respective work assignments and back home at

---

[1] The distinction matters because Plaintiffs' proposed classes encompass individuals employed by Comcast "during the applicable statute of limitations period," which differs across Plaintiffs' state law claims. (Dkt. No. 162 at 4-5.) The limitations period for an IMWL claim is three years and, according to Plaintiffs, covers service technicians employed at any time between February 17, 2009 and the present. (*Id.* at 5.) The limitations period for an IWPCA claim, by contrast, is ten years and would cover technicians employed since February 17, 2002. (*Id.*)

the end of the day. The purpose of the program is to "allow [Comcast] to realize a reduction in shift variance . . . which allows greater point capacity for the team." (*Id.* at 2.) In layman's terms, home dispatching eliminates the time wasted by requiring service technicians to drive into the office, especially when their first or last appointment may be closer to their homes. Service technicians who "home garage," by contrast, drive to a designated reporting location in the morning before driving to their first job. Both types of service technicians keep their Comcast work vehicles at home overnight. Participation in both programs is voluntary, requires that technicians have at least two years of experience, and is not available to technicians subject to an ongoing disciplinary action. (*Id.* at 3.)

Technicians who home dispatch drive a Comcast vehicle directly from their home to work assignment and back, and are paid for the commute to their first job assignment. Technicians who home garage also drive Comcast vehicles home at night but in the morning they drive to their designated reporting location, typically a warehouse, rather than straight to the first job. (Dkt. No. 166-4.)

## I. Comcast's Policies

### A. Work Day Policies

Comcast's official policy is that the work day starts when technicians log onto TechNet, which is Comcast's dispatching application. Technicians who home dispatch are supposed to log onto TechNet "no earlier than two minutes before beginning any Comcast related work or traveling to the first work assignment," (Dkt. No. 166-4 at C_W007100), and not to engage in any work-related activities beforehand. Although the work day starts by logging onto TechNet, technicians are not supposed to immediately leave for their first job. Instead, Comcast requires all technicians to perform the "Circle of Safety" before they head out for the day. (Dkt. No. 162 Ex. L.) The Circle of Safety is a 360-degree walk around the service vehicle to check for dents,

scratches, leaking fluid, and—most importantly—external hazards that might cause an accident. (*Id.* Exs. L, Q.) At least one Comcast document describes the Circle of Safety as a routine that should take approximately thirty seconds. (*Id.* Ex. Q.) Technicians are also supposed to review their work assignments on TechNet before departing for the first job, a task that Comcast estimates should also take about thirty seconds or one minute. Comcast expects home dispatch technicians to arrive at their first job as close to 8:00 a.m. as possible, and no later than 8:15 a.m. (Dkt. No. 162 Ex. L at 3.) If technicians will arrive later than 8:15 a.m., they are supposed to notify their supervisors in advance. (*Id.*)

For home garage technicians, Comcast prohibits them from performing work duties before commuting to garage, prohibits them from logging into TechNet or performing work tasks before or during their commute, and instructs these technicians to log into TechNet after arriving at the garage and before beginning any work-related tasks. (*Id.*)

At the end of the day, both home dispatch and home garage technicians are supposed to log out of TechNet before commuting home and "when all Comcast work-related tasks are complete . . . At this point, the technician is no longer working and must not perform any Comcast duties." (*Id.*) In other words, Comcast does not pay technicians for their commute home. Although the work day officially ends after the last job, technicians are also required to bring their meters into their homes at night to charge them and to lock their vehicles. (Dkt. No. 162 Ex. G at 27-28.)

### B.  Time Entry Policies on ESS

Comcast requires technicians "keep accurate and complete time records each day . . . by properly recording all work time in ESS," Comcast's time logging application which is separate from TechNet. (Dkt. No. 162-17 at 49.) The technicians are instructed to record their start time,

the time they begin and end lunch, and their end time. (*Id.*) Comcast's technicians are paid hourly and receive additional pay for overtime hours worked in excess of their scheduled shifts.

## II.    Technicians' Actual Practices

Plaintiffs contend that notwithstanding Comcast's policies regarding start, end, and lunch times, technicians perform a significant amount of work before they start their shifts, during their lunch breaks, and after their shifts are supposed to be over, and do not receive any compensation for their off the clock work.

### A.  Pre-Shift

In support of Plaintiffs' assertion that technicians perform work before the their claims regarding start times, Plaintiffs submitted a report by Dr. Albert Madansky, comparing ESS start time data with TechNet log in data. (Dkt. No. 162 Ex. D.) Dr. Madansky determined that at least 78.8% of technicians logged into TechNet before the start time recorded in ESS, and that the mean difference between the time a technician logged into TechNet and the start time recorded in ESS was 27.83 minutes. Dr. Madansky apparently did not distinguish between home dispatch or home garage technicians, nor did he segregate technicians who neither home dispatched nor home garaged. Plaintiffs also omit two details in the summary of Dr. Madansky's analysis. First, it is undisputed that technicians, not Comcast, are responsible for recording their start, break, and end times in ESS.[2] Second, the standard deviation associated with Dr. Madansky's mean analysis is quite high—23.71 minutes—suggesting that Dr. Madansky's simple average might not be the most appropriate tool for this particular analysis.

---

[2]    Plaintiffs acknowledge that technicians are responsible for entering their own time, but nevertheless state that "Comcast recorded [the technicians'] start time." (Dkt. No. 162 at 25.)

Based on Dr. Madansky's analysis, Plaintiffs contend that technicians were not paid for an average of at least 27.83 minutes of work each day. Defendants do not contest the general discrepancy between the TechNet login and ESS start times, and instead point out that technicians logged into TechNet early for a variety of different reasons and did not perform "work" after logging into TechNet but before recording their start time in ESS. For example, several technicians testified that they log into TechNet before getting dressed and ready for work. (Dkt. No. 175 at 21.) Defendants also dispute Plaintiffs' contention that they had to perform their preliminary tasks off the clock, but after logging into TechNet, in order to arrive at their first jobs by 8:00 a.m. Several Plaintiffs testified that reviewing their work assignments on TechNet at the outset of the day generally took between thirty seconds and two minutes. (*Id.*) Along the same lines, other Plaintiffs testified that they did not perform any vehicle safety checks before leaving for the day, and that the safety checks involved little more than walking around the vehicle to make sure nothing was out of place—a task that should take less than one minute according to Comcast's official policies on the "Circle of Safety."

### B. Meal Breaks

Plaintiffs initially contended that Comcast, pursuant to its policy to provide technicians with a 30 minute unpaid meal break, automatically deducts 30 minutes from its technicians' pay for each day worked. (Dkt. No. 162 at 26.) After Defendants asserted in their response that no such policy exists and is in fact a complete fabrication, Plaintiffs amended their factual allegations to state that technicians work through lunch at the direction of "dispatch and/or management." (Dkt. No. 180 at 19.) Both parties acknowledge that the technicians are responsible for recording their own lunch breaks in ESS. Technicians report a variety of different lunch time interruptions, some from Comcast and some from customers. The frequency of the interruptions varies from every day to once per month, and the duration of the interruptions

varies from a few seconds for a technician to look at a text message from a supervisor to a technician missing an entire lunch break to get to a job.

### C. Post-Shift Work

Plaintiffs finally contend that Comcast did not permit technicians to record time spent driving from their last job back home, even though technicians had to perform work once they arrived home. The work technicians allegedly had to perform at home constituted locking their Comcast vans and bringing their hand held devices inside to charge. (Dkt. No. 162 at 28.) Plaintiffs also argue that Comcast's policy of not paying for drive time home from the last job is "inconsistent" with Comcast's policy to pay for drive time from home to the first job, although they do not explain how the inconsistency results in off the clock work or a violation of Illinois wage laws.

To summarize, Plaintiffs allege and seek class approval of three classes for compensation they were allegedly not paid for the work they allegedly performed: (1) initially reviewing the day's tasks on TechNet and conducting required safety checks of their vehicles; (2) working through unpaid meal beaks; and (3) unloading and securing their vehicles at the end of the workday. Defendants, by contrast, seek to decertify the FLSA collective class the court conditionally certified on October 9, 2012, without opposition, to facilitate discovery and notice. (Dkt. No. 67.) Defendants argue that Plaintiffs' proposed collective class cannot withstand the stricter, more probing inquiry required at the second stage of the FLSA collective action process. (Dkt. No. 165.)

## **LEGAL STANDARD**

### I. **Rule 23 Class Certification**

To obtain class certification under Rule 23, a plaintiff must satisfy each requirement of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one

subsection of Rule 23(b). *See Harper* v. *Sheriff of Cook County,* 581 F.3d 511, 513 (7th Cir. 2009); *Oshana* v. *Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006). Once a party satisfies the requirements of Rule 23(a), he must meet one of the requirements of Rule 23(b). In this case, Plaintiff argues that class certification is appropriate under Rule 23(b)(3) or, in the alternative, Rule 23(b)(2) or 23(c)(4). A court may certify a Rule 23(b)(3) class where "questions of law and fact common to members of the class predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently resolving the dispute in question." Fed. R. Civ. P. 23(b)(3). Under Rule 23(b)(2), a court may certify a class where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."

In order to grant class certification under Rule 23, the Court must be "satisfied, after a rigorous analysis" that Rule 23's requirements are met. *Wal–Mart Stores, Inc.* v. *Dukes,* —— U.S. ——, 131 S. Ct. 2541, 2551 (2011) (citation omitted). " 'Failure to meet any of the Rule's requirements precludes class certification.'" *Harper,* 581 F.3d at 513 (quoting *Arreola* v. *Godinez,* 546 F.3d 788, 794 (7th Cir. 2008)). Satisfaction of these requirements, on the other hand, categorically entitles a plaintiff to pursue his claim as a class action. *See Shady Grove Orthopedic Assocs., P.A.* v. *Allstate Ins.,* 559 U.S. 393, 398-99 (2009). The plaintiff bears the burden of proving each disputed requirement by a preponderance of the evidence. *Messner* v. *Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). District courts have broad

discretion in determining whether the plaintiff has satisfied this burden. *See Reiter* v. *Sonotone Corp.,* 442 U.S. 330, 345 (1979); *Messner,* 669 F.3d at 811.

## II.     FLSA Collective Action

        "Under Section 216(b) of the FLSA, employees may bring a collective action on behalf of themselves and other 'similarly situated' employees against employers who violate the Act's minimum wage or overtime provisions." *Smallwood* v. *Ill. Bell Tel. Co.,* 710 F.Supp.2d 746, 750 (N.D. Ill. 2010) (quoting 29 U.S.C. § 216(b)). "District courts have considerable discretion in implementing Section 216(b)." *Allen* v. *City of Chic.,* No. 10 C 3183, 2013 WL 146389, at *2 (N.D. Ill. Jan. 14, 2013). Importantly, "[t]he FLSA does not define the term 'similarly situated,'" *Russell* v. *Ill. Bell Tele. Co.,* 721 F.Supp.2d 804, 811 (N.D. Ill. 2010), and "[n]either the Supreme Court nor the Seventh Circuit has specified a procedure courts must employ to decide certification and notice issues under the FLSA." *Allen,* 2013 WL 146389, at *2. Notwithstanding this lack of explicit direction, "the majority of courts ... have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action." *Jirak* v. *Abbott Labs., Inc.,* 566 F.Supp.2d 845, 847 (N.D. Ill. 2008) (noting five courts of appeal which have affirmed the use of the two-step approach to FLSA certification cases). Courts in this district routinely employ this two-step process to determine whether FLSA claims should proceed as a collective action. *See, e.g., Rottman* v. *Old Second Bancorp, Inc.,* 735 F.Supp.2d 988, 990 (N.D.Ill.2010) ("[C]ourts in this district and around the country have settled on a two-step procedure for dealing with collective actions under the FLSA.") (internal citations omitted).

        At the second step of the FLSA analysis, the posture of this case, a court reevaluates the appropriateness of certification after members of the collective action have opted in and the parties have conducted discovery. "Once it is known which employees will be part of the class,

the court must reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis." *Id.* During this reevaluation a "[d]efendant may then move to decertify the class or divide the class into subclasses." *Smallwood,* 710 F.Supp.2d at 753. "The Court must consider: (1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Franks* v. *MKM Oil, Inc.,* No. 10 C 00013, 2012 WL 3903782, at *10 (N.D. Ill. Sept. 7, 2012). "These factors help a court determine whether it can manage the case and bring about a fair and reasonably expeditious resolution of the collective action." *Russell,* 721 F.Supp.2d at 811.

Despite the opt-out versus opt-in difference between collective actions under the FLSA and class actions under Rule 23, the Seventh Circuit has suggested that they should nevertheless be treated the same for purposes of certification. *See Espenscheid* v. *DirectSAT USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("[T]here isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences."); *see also Alvarez* v. *City of Chicago,* 605 F.3d 445, 449 (7th Cir. 2010) (analyzing whether "common questions predominate[d]" in a proposed FLSA collective action). Although other circuits have not likewise merged the standards for class actions and FLSA collective actions, Seventh Circuit precedent remains binding here. The court will therefore consider both the proposed collective action and class action in this case "as if it were a single class action" and apply the Rule 23 standards to Plaintiffs' motion for class certification and Comcast's motion for FLSA decertification.

*Espenscheid,* 705 F.3d at 772 (treating the FLSA "collective" and the Rule 23 class as a single class and applying Rule 23's standards in evaluating a motion to decertify both claims).

## ANALYSIS

**I.** **Rule 23(a)**

Plaintiffs move to certify the following three classes:

All individuals who were employed, or are currently employed, by Comcast Corporation in the State of Illinois, during the applicable statute of limitations period, as service technicians who performed work before the start of their shifts without pay and worked in excess of 40 hours in any given workweek (the "Pre-Shift Class").

All individuals who were employed, or are currently employed, by Comcast Corporation in the State of Illinois, during the applicable statute of limitations period, as service technicians who were subjected to meal break deductions regardless of whether uninterrupted meal breaks were actually taken and worked in excess of 40 hours in any given workweek (the "Meal Break Class").

All individuals who were employed, or are currently employed, by Comcast Corporation in the State of Illinois, during the applicable statute of limitations period, as service technicians who performed work after the end of their shifts without pay and worked in excess of 40 hours in any given workweek (the "Post-Shift Class").

(Dkt. No. 162 at 11-12.)[3] Although the Pre-Shift and Post-Shift Classes purport to include all Comcast service technicians, Plaintiffs clarified in their reply brief that they intend the Pre-Shift and Post-Shift Classes to be limited to those technicians who home dispatch or home garage, not all service technicians. The Meal Break Class, by contrast, is meant to include all service technicians. (Dkt. No. 180 at 11.)

Plaintiffs argue that each of the proposed classes satisfy the requirements of Rule 23(a) and Rule 23(b)(3). "When determining whether to certify a class, the court must make an

---

[3]   According to Plaintiffs' motion, the applicable statute of limitations for their IMWL claims is three years—February 17, 2009 to the present—and the applicable statute of limitations for their IWPCA claims is ten years—February 17, 2002 to the present. (Dkt. No. 162 at 12.)

independent determination about the appropriateness of certifying the class." *Davis* v. *Hutchins*, 321 F.3d 641, 649 (7th Cir. 2009).

### A. Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all its members is impracticable. The court may not rely solely on Plaintiffs' allegations as to the size of a class or the impracticability of joinder, and instead must rely on evidence to prove class size. *Szabo* v. *Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

In this case, Plaintiffs state that data produced by Comcast indicate that at least 3,000 service technicians were employed during the applicable statute of limitations periods. (Dkt. No. 162 at 19, 18.) That number would likely be sufficient had Comcast not "clarified" in its reply brief that the Pre-Shift and Post-Shift Classes, unlike the Meal Break Class, include only those service technicians who home garage or home dispatch, not all service technicians. Plaintiffs' clarification regarding the class definitions is problematic because it leaves the court with no information concerning the sizes of the Pre-Shift and Post-Shift Classes, *i.e.*, the number of technicians who home dispatched or home garaged during the relevant period. There are at least three class members—the Named Plaintiffs—and probably many more, but the court has no baseline estimate from which to make a numerosity determination. As discussed earlier, home garage and home dispatch technicians are a subset of Comcast's technician workforce; they must volunteer, have at least two years of experience, and have a clean disciplinary record. The court cannot guess the percentage of service technicians who home dispatch or home garage. Although Plaintiffs need not establish the exact number of class members, they must provide *some* estimate that allows the court to make the required factual and legal inquiries under Rule 23. Plaintiffs here have failed to do that. The court, therefore, finds that Plaintiffs have satisfied the numerosity requirement with regard to the Meal Break Class, which Plaintiffs estimate includes

all 3,000 service technicians active in Illinois during the relevant period. But they have not satisfied the numerosity requirement with regard to the Pre-Shift and Post-Shift Classes because they have failed to provide any estimate of the number of technicians who home dispatched or home garaged in Illinois during the relevant period.

### B. Commonality

Rule 23(a)(2) requires the existence of questions of law or fact common to the class. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S. Ct. 2541, 2551 (2011) (quotation and citation omitted). This requirement, however, does not mean that the proposed class members have merely "all suffered a violation of the same provision of law." *Id.* Rather, the claims of a class must depend upon a common contention, and that contention must be capable of classwide resolution. *Id.* "What matters to class certification is the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 756 (7th Cir. 2014) (quoting *Wal–Mart,* 131 S. Ct. at 2551). "The critical point is the need for *conduct* common to members of the class." *Id.* (citing *IKO Roofing Shingle Prods. Liability Litig.,* 757 F.3d 599 (7th Cir. 2014); *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998). Where the defendant's allegedly injurious conduct differs from class member to class member, courts are not likely to find common answers. *Id.* Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, however, there is a common question. *Id.* (citing cases).

As an initial matter, it is difficult to unearth from the briefs what, precisely, Plaintiffs believe to be the questions of law or fact common to the class (or classes). Plaintiffs initially contend there are three "overarching questions" common to "all technicians":

1. Did technicians begin work before the start of their scheduled shift without pay, and did Comcast "suffer or permit" that work? (Dkt. No. 162 at 8.)

2. Did Comcast have a policy or practice of automatically deducting 30 minutes of pay each day for meal breaks without accurately recording them and regardless of whether such breaks were actually taken? (*Id.* at 9.)

3. Did technicians continue to perform work after the end of their scheduled shift without pay, and did Comcast "suffer or permit" that work? (*Id.* at 10.)

Plaintiffs later identify a set of similar "common legal issues," which are whether Comcast failed to pay technicians for:

1. [D]ocumented time spent logging into Comcast's routing applications, receiving and reviewing work orders, providing "ETAs", loading tools and equipment and conducting safety inspections before they left home each work day;

2. [T]ime spent working through unpaid and unrecorded meal breaks; and

3. [T]ime spent unloading and securing their Comcast work vehicles, tools and equipment and completing their work day.

(Dkt. No. 162 at 33.) Plaintiffs also characterize the preceding "common legal issues" as "discrete common injuries that are based on three corresponding policies." (*Id.* at 35.)

Finally, at the end of their argument concerning commonality, Plaintiffs list without significant explanation the following "issues of law and fact related to [the] common questions" of whether Comcast had a practice of instructing technicians to perform work before their shift, during meal breaks, and after their shifts:

1. Whether Comcast failed its duty to make and maintain true and accurate time records for all time worked by the Plaintiffs and the Class;

2. Whether logging into Comcast's routing database, receiving and reviewing work assignments and entering ETAs are principal activities that begin technicians workdays;

3. Whether Plaintiffs and the Class worked before the start of their scheduled shifts;

4. Whether Comcast paid Plaintiffs and the Class for all time worked before the start of their scheduled shifts;

5. Whether Comcast failed its duty to keep a record of technician meal breaks;

- 14 -

6. Whether Comcast automatically deducted 30 minutes of pay from technicians for purported meal breaks, regardless of whether such breaks were taken;

7. Whether unloading and securing tools, equipment and company assigned vehicles are work activities that end the work day;

8. Whether Plaintiffs worked after the end of their scheduled shifts;

9. Whether Comcast paid Plaintiffs and the Class for all time worked after the end of their scheduled shifts; and

10. Whether Comcast failed to compensate Plaintiffs and the Class for all work performed in excess of 40 hours per work week with overtime wages.

(Dkt. No. 162 at 20.)

The overarching issue with all of Plaintiffs' common questions is their inability to produce "common *answers* apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (citations and quotations omitted) (emphasis original). Plaintiffs have failed to identify a common practice or policy of instructing technicians to work before their shift starts, during lunch, or after their shift ends. In the absence of any standardized conduct toward members of the proposed classes, the court must make a series of individual inquiries to determine whether technicians in fact worked pre-shift, post-shift, or during their meal breaks. And the answer for one technician does not necessarily shed light on the answer for another. *See Dukes*, 131 S. Ct. at 2552 ("Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored.")

## 1. Plaintiffs Have Failed to Establish Common Comcast Policies Mandating Off-The-Clock Work

At least some of Plaintiffs' common "issues" allege that Comcast had policy or practice of instructing technicians to perform work before and after their shifts and during unpaid meal breaks. Plaintiffs, although accorded the opportunity for discovery, have not put forth sufficient

evidence to meet their threshold burden that any such policies ever existed classwide. As discussed in the earlier sections, Comcast purports that its policies required technicians to report all of the time they worked, even if they worked outside of their scheduled shifts. The majority of Plaintiffs concede that they were never instructed to work off-the-clock, and that they were paid for overtime whenever they recorded it. (Dkt. No. 165 at 12-13 (collecting deposition testimony).) Moreover, although the Plaintiffs have presented some evidence of Comcast's policies instructing them to perform perfunctory vehicle checks before starting their work day, "they have directed the court to no evidence of a common policy that required such work to be performed off the clock and without overtime pay." *See Fernandez* v. *Wells Fargo Bank, N.A.*, 2013 WL 4540521, at *10 (S.D.N.Y. Aug. 28, 2013).

Instead, the Plaintiffs proffer multiple different explanations for why they did not report their alleged off-the-clock work, ranging from workload, to desire to be a team player, to "personal choice." Other technicians gave no explanation for failing to report off-the-clock work. (Dkt. No. 175 at 28.) Although a few technicians claimed that their supervisors directed them to work off the clock, the majority swore they were never directed to work off the clock or not to record work time outside of their scheduled shift. "These differences between the technicians' experiences and supervisor discretion make it impossible to generate common answers on a classwide basis." *Boelk* v. *AT&T Teleholdings, Inc.*, 2013 WL 261265, at *10 (W.D. Wis. Jan. 10, 2013) (declining to certify wage and hour claims brought by cable technicians); *see also Hawkins* v. *Securitas Security Servs., USA, Inc.*, 280 FRD 388, 399 (N.D. Ill. 2011) (Feinerman, J.) (whether employer suffered or permitted work by one employee who was never told to arrive fifteen minutes early "presents a far different question than that presented by" another employee,

who worked at another site "and who was specifically instructed to arrive fifteen minutes early and always did so").

### 2.    Actual Performance of Pre- and Post-Shift Work

The court similarly cannot generate common answers to determine whether home garage and home dispatch technicians actually performed any pre-shift or post-shift work, an issue central to Plaintiffs' claims. As an initial matter, the pre-shift and post-shift routine differs between two types of technicians, home dispatch and home garage. Proof that one type of technician performed off-the-clock work does not establish the same for the other. For example, although both types of technicians are instructed to perform the "Circle of Safety" before driving their vehicles, only home dispatch technicians log into TechNet from home; home garage technicians do not access TechNet and review work assignments until they arrive at their designated warehouse. Accordingly, determining that one home dispatch technician logged into TechNet from home before 7:30 a.m. does not advance the resolution of a home garage technician, who would not log into TechNet until he arrived at his warehouse (after his shift started).

Moreover, the discrepancy between a technician's TechNet login time and his or her self-recorded start time does not mean the technician actually worked during the non-overlap period. In their deposition testimony, many technicians describe logging in early, checking their schedule for the day, and then engaging in their morning routine of getting dressed, eating breakfast, looking at the news, or just relaxing before work. (Dkt. No. 175 at 21.) Other technicians, by contrast, testified that they typically log into TechNet immediately before leaving for work. The evidence shows that the various technicians engaged in a variety of different routines at the start of the day, and the fact that one technician logged into TechNet early and worked does not mean that another technician did the same, even if that technician also logged

into TechNet before his scheduled start time. In other words, proof as to one claimant would not be proof as to all members of the class. *Butler* v. *Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (holding issue central to validity of the claim must be capable of being resolved "in one stroke").

The same discrepancies exist with regard to post-shift work and again would require the court to pursue individualized assessments to adjudicate Plaintiffs' post-shift claims. For example, answering the question whether a home dispatch technician must perform off-the-clock work by unloading his equipment at home says nothing for a home garage technician who keeps his equipment at a warehouse. And like pre-shift activities, the evidence shows that even technicians of the same "type" engaged in different post-work routines that prevent the court from determining "in one stroke" whether technicians actually performed off-the-clock work at the end of the day. Some technicians reported simply grabbing their phone and meter and going inside their homes, whereas others report spending some time securing their vehicles. (Dkt. No. 175 at 26.)

Ultimately, Plaintiffs have failed to establish by a preponderance of the evidence that there is a pattern to the frequency, manner or duration of home dispatch and home garage technicians' pre-shift and post-shift activities. In the absence of a such a pattern, the court cannot fashion a common answer to the question of whether Plaintiffs actually worked pre-shift and post-shift work, which is a question central to Plaintiffs' claims. *See Espenscheid* v. *DirectSat USA, LLC*, 2011 WL 2009967, at *7 (W.D. Wis. May 23, 2011), *aff'd* 705 F.3d 770 (7th Cir. 2013) ("At a high level of generality, the opt-in plaintiffs and class members perform similar job duties and are subject to the same corporate policies. But in terms of individual experiences, the

evidence shows that opt-in plaintiffs and class members have different work experiences and were affected by defendants' policies in different ways.")

### 3. Meal Break Class

Plaintiffs initially proposed a common question of "[w]hether Comcast automatically deducted 30 minutes of pay from technicians for purported meal breaks, regardless of whether such meal breaks were taken." (Dkt. No. 162 at 20.) Plaintiffs appear to have abandoned this question in their reply brief, (Dkt. No. 180), likely because Comcast asserted in its response that there was absolutely no evidence of such an automatic deduction policy (and Plaintiffs have provided none). Instead, in their reply, Plaintiffs assert that numerous technicians were instructed by management and dispatch to work without pay during their lunch breaks. (*Id.* at 19.) As with their pre-shift and post-shift claims, however, the court cannot determine "in one stroke" whether all technicians were instructed by supervisors and dispatchers to work through lunch without pay. A number of technicians testified that their supervisors or dispatchers reminded them to take a lunch break, whereas others testified to having supervisors "interrupt" their lunch breaks with work requests. (Dkt. No. 175 at 22-23.) The putative Meal Break Class includes technicians from 50 different garages who reported to more than 250 supervisors. When the alleged lunch instructions varied by supervisor, as the evidence shows here, the individual determinations the court must make undermine the commonality requirement of Rule 23(a). *See Bolden* v. *Walsh Const. Co.*, 688 F.3d 893, 896 (7th Cir. 2012) ("To evaluate plaintiffs' grievances about [defendant] . . . a court would need site-specific, perhaps worker-specific, details, and then the individual questions would dominate the common questions (if, indeed, there turned out to be any common questions).").

Furthermore, Plaintiffs have failed to establish the possibility of a common answer concerning the frequency or duration of meal break work. As discussed earlier, some technicians

reported being interrupted almost every day by supervisors, while others reported receiving a lunchtime call from supervisor once or twice per month. Some technicians reported having to drop their lunch and proceed to a job, whereas others reported minor disruptions from an occasional text message. Plaintiffs have likewise failed to show that the question of *why* they failed to report work through meal breaks could be resolved on a classwide basis. The technicians who reported working through meal breaks assert that they were instructed to do so, but none assert that they were also instructed not to report the work.

In light of the variation in instructions from more than 250 supervisors, and the variation in the frequency, nature, and duration of the lunch break interruptions, Plaintiffs have not established by a preponderance of the evidence that any common questions central to their meal break claim could be resolved on a classwide basis. *See Boelk*, 2013 WL 261265, at *12; *see also York* v. *Starbucks Corp.*, 2011 WL 8199987, at *26 (C.D. Cal. Nov. 23, 2011) (concluding that meal break claims failed to meet Rule 23 commonality requirement because plaintiff conceded that "whether an employee took a proper meal break depended on who was running the shift . . . which indicates that violations resulted from individual action and not a corporate-wide policy or practice . . . . [A]n evaluation of a meal break claim as to any individual would involve a variety of particularized factors that would not necessarily impact any other company employee.").

Because the court concludes that Plaintiffs have not satisfied the numerosity requirement of Rule 23(a) for the Pre-Shift and Post-Shift Classes, and have not satisfied the commonality requirement of Rule 23(a) for any of the proposed classes, the court need not address the remaining factors of Rule 23(a) or 23(b). As noted earlier, the Seventh Circuit has instructed district courts to treat proposed collective actions and class actions in the same case "as if [they] were a single class action" and apply the Rule 23 standards for both claims. The court, having

found based on the facts in the record that Plaintiffs have not satisfied the requirements of Rule 23, must likewise conclude that Plaintiffs have not established sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis pursuant to the FLSA. *See Espenscheid*, 705 F.3d at 772. In other words, Plaintiffs' proposed collective class cannot withstand the stricter, more probing inquiry required at the second stage of the FLSA collective action process.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' "Motion . . . for Rule 23 Class Certification" [162] is denied, and Comcast's "Motion for FLSA Decertification" [169] is granted. This case is decertified as a collective action and the claims of the opt-in plaintiffs and unnamed class members are dismissed without prejudice. The case is set for status on June 18, 2015 at 9:00 a.m., at which time the parties should be prepared to discuss how to move forward with the Named Plaintiffs' individual claims. The parties are again encouraged to discuss settlement.


ENTER:


JAMES F. HOLDERMAN
District Judge, United States District Court


Date: June 1, 2015